UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JIMMIE SIMPSON,

                Plaintiff,                                        Hon. Janet T. Neff

v.                                                  Case No. 1:15 CV 357

CORIZON HEALTH, INC., et al.,

                Defendants.

_____/

**REPORT AND RECOMMENDATION**

        This matter is before the Court on Defendant's Motion for Summary Judgment, (ECF No. 36), Defendant's Motion for Summary Judgment, (ECF No. 52), Defendants' Motion for Summary Judgment, (ECF No. 66), and Defendants' Motion for Summary Judgment, (ECF No. 74). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendant's Motion for Summary Judgment, (ECF No. 36), be **denied without prejudice**; Defendant's Motion for Summary Judgment, (ECF No. 52), be **granted**; Defendants' Motion for Summary Judgment, (ECF No. 66), be **granted**; Defendants' Motion for Summary Judgment, (ECF No. 74), be **granted**; and this action **terminated**.


**BACKGROUND**

        Plaintiff Jimmie L. Simpson is a state prisoner incarcerated with the Michigan Department of Corrections (MDOC) at the Muskegon Correctional Facility (MCF), though the relevant events occurred while Plaintiff was incarcerated at Macomb Correctional Facility (MRF) and Kinross Correctional Facility (KCF). Plaintiff initiated this action against Corizon Health, Inc. (Corizon) and Aetna Life Insurance Inc. (Aetna), as well as the following individuals: Daniel Heyns; Rebecca Nevai,

Lance Kingsbury, Sergio Paneque, Lia Gulick, Jeffrey Stieve, Keith Papendick, Jesus Neri, Jr., S. Laughhunn, Joshua Schad, Patricia Lamb, Richard Russell, Penny Rogers, and Gary Kerstein.

In his complaint and supplement thereto, Plaintiff alleges the following. While Plaintiff was housed at MRF from 1997 to May 27, 2008, he repeatedly complained to healthcare services about pain in his lower back, right wrist and hand, left knee, and shoulders. Plaintiff was eventually diagnosed with "Juvenile Arthritis Disease" and given prescriptions for nonsteroidal anti-inflammatory drugs (NSAIDs). On May 27, 2008, he was transferred to KCF, where he continued to receive NSAIDs as well as a sleeping agent. After his transfer, Plaintiff repeatedly complained of pain radiating into his neck, shoulders, lower back, pelvis, thighs, legs, knees, and feet.

On December 21, 2010, Nurse Rogers diagnosed Plaintiff with "Paget's Disease,"[1] but refused to treat it due to "non-medical reasons and budget cuts." Plaintiff repeatedly complained to healthcare services about painful symptoms. On September 8, 2011, Nurse Rogers ordered x-rays of Plaintiff's lower spine. After reviewing the results, the radiologist recommended further assessment with an MRI and further "workup" of Plaintiff's Paget's disease. On October 19, 2011, Plaintiff participated in an MRI of his spine the results of which revealed several abnormalities.

Plaintiff continued to complain about his symptoms, and on October 25, 2011, Nurse Rogers referred him to the MDOC's Pain Management Committee. On November 2, 2011, Defendant Stieve denied Plaintiff "appropriate" pain medication and a referral to a neurosurgeon, despite the fact that the medication Plaintiff was receiving was not adequate. Plaintiff subsequently filed a "formalized complaint" with Dr. Stieve, Dr. Neri, and Nurse Rogers regarding a lack of treatment for his pain, which

---

[1] Paget's disease "interferes with [the] body's normal recycling process, in which new bone tissue gradually replaces old bone tissue" which "can cause affected bones to become fragile and misshapen." *See* Paget's disease of bone, available at http://www.mayoclinic.org/diseases-conditions/pagets-disease-of-bone/home/ovc-20183843 (last visited on September 13, 2016).

had become so severe that it was affecting his ability to stand or walk for prolonged periods of time. On December 20, 2011, Plaintiff filed a grievance against Defendants Stieve, Neri, and Rogers for depriving him of adequate medical care and a consultation with a neurosurgeon.

On January 10, 2012, Plaintiff filed a "formalized complaint" with Defendants Stieve, Neri, and Rogers, detailing his continuing symptoms and asking to be referred to a specialist for consideration of other treatment options. On January 17, 2012, Plaintiff filed a grievance against Defendants Stieve, Neri, and Rogers regarding their refusal to provide adequate pain medication or to refer him to a specialist. On March 13, 2012, Nurse Rogers referred Plaintiff to the MDOC's Pain Management Committee for reevaluation of Dr. Stieve's prior decision. Dr. Stieve denied Plaintiff's request for additional medication and a consultation with a neurosurgeon.

Plaintiff met with Nurse Rogers on May 23, 2012, and informed her that the sleeping agent did not relieve his pain and was causing other complications, and that the NSAID pain medication was not effective. Plaintiff asked for an epidural injection. Nurse Rogers decided to discontinue the sleeping agent and told Plaintiff that she had done all that she could. She referred Plaintiff to Dr. Neri who referred Plaintiff to the MDOC's Pain Management Committee. Once again, on August 29, 2012, Dr. Stieve denied Plaintiff additional pain medication and a consultation with a neurosurgeon.

On September 5, 2012, Plaintiff asked Dr. Neri why Dr. Stieve would prescribe Elavil, knowing that Plaintiff suffers harmful side effects from it (i.e., migraines) and that it did not alleviate Plaintiff's symptoms. Dr. Neri stated that he did not have authority to order a "non-formulary" medication; only Dr. Stieve had that authority. Plaintiff asked Neri for a referral to a neurosurgeon. Dr. Neri stated that Dr. Stieve would not approve such a consultation until Plaintiff could no longer walk. Dr. Neri then performed a prostate examination on Plaintiff in front of Nurse Rogers, which involved

"[poking], pushing and squeezing" Plaintiff's prostate gland while asking, "[I]s it coming out yet?  It is coming out yet?," until Plaintiff's gland was "empty" and there was a "large" amount of "cloudy" fluid on the floor.  Dr. Neri performed this examination as retaliation for Plaintiff's "continuous complaining."

Plaintiff was humiliated by this experience.  Plaintiff asked if that was the proper method for performing a prostate exam, and Dr. Neri stated, "This is the proper way of doing a Prostate Examination, you have to feel how large the gland is, feel for any small bumps on the gland and . . . squeeze the fluid out."  Plaintiff subsequently filed a "formalized complaint" with the MDOC's "Bureau of Health Service" and with Defendants Stieve, Neri, and Rogers for being denied pain medication and a consultation with a neurosurgeon, and for being subjected to an "inappropriate" prostate examination.

On September 17, 2012, during Plaintiff's annual screening, Nurse Rogers stated that: Dr. Stieve "[i]s not going to give Plaintiff narcotic for pain"; "no surgeon is going to tear up Plaintiff's back for Spinal Stenosis"; and that Plaintiff would not receive a consultation with a neurosurgeon until he is not able to move his legs or feet.  Rogers further stated that "[i]f Plaintiff keeps complaining about [t]he Psychotropic medication, all [Dr. Stieve] is going to give Plaintiff . . . is Aspirin and Anti-Inflammatory (NSAID)."  Plaintiff later filed a grievance against Defendants Stieve, Rogers, and Neri, complaining that they were ignoring his symptoms and forcing him to take a psychotropic medication (Elavil) that gives him migraine headaches and a sleeping agent (Pamelor) that does not work.

Plaintiff requested a transfer out of KCF.  On April 30, 2013, he was transferred to MCF into the care of Dr. William Nelson and Physician's Assistant Barbara Bien neither of whom are Defendants in this action.  On May 19, 2013, Plaintiff filed a "formalized complaint" with the healthcare

unit at MCF, requesting a hot water bottle, a walking cane, and a TENS unit[2] for his "severe and painful neurology symptoms."  Plaintiff later filed a grievance complaining that he was denied these items.

On July 13, 2013, Plaintiff filed a "formalized complaint" with the MDOC's "Bureau of Health Care," requesting the names of all doctors and other medical staff who were involved in making decisions on behalf of the Pain Management Committee.  Plaintiff thereafter filed a grievance complaining that "Defendants" denied him this information.

In December 2013, Plaintiff filed a criminal complaint with the Michigan state police against Defendants Stieve, Neri, Rogers, Laughhunn, Lamb, and Russell.  He also filed a grievance complaining that: (1) Director Heyns, along with Corizon and Aetna, approved and implemented a policy of cutting costs that resulted in less effective medical care for Plaintiff; (2) Defendants Stieve, Neri, and Rogers failed to provide an adequate MRI, failed or refused to provide Plaintiff with a consultation with a neurosurgeon, and failed or refused to provide adequate pain medication; and (3) Defendants Stieve, Neri, Rogers, Lamb, and Laughhunn failed or refused to take corrective action in response to Plaintiff's alleged sexual assault (i.e. prostate exam) by Defendant Neri.  In January 2014, Plaintiff received a response to his criminal complaint, indicating that all matters regarding the denial of health care would be referred to the Internal Affairs division of the MDOC, and that division would review Plaintiff's allegations to determine whether a criminal investigation is warranted.

On February 5, 2014, after Plaintiff continued to complain about his "painful neurology symptoms," PA Bien referred Plaintiff to the MDOC's Pain Management Committee.  Two weeks later, Dr. Stieve denied Plaintiff additional pain medication and a consultation with a neurosurgeon.  On

---

[2]Plaintiff uses the term "Tents Unit," but the Court assumes that Plaintiff is referring to a TENS device, which transmits an electric current through the skin in order to stimulate nerves and provide relief from pain.  *See* http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nerve-stimulation-tens-topic-overview (visited August 24, 2015).

February 24, 2014, Plaintiff complained to Bien that his pain had spread to the right side of his neck and arms.  X-rays of Plaintiff's spine, taken February 26, 2014, revealed mild abnormalities.  Plaintiff later filed a grievance complaining that Defendants Stieve and Papendick refused to approve a MRI or a referral to a neurosurgeon, and refused to provide additional pain medication or other treatment options until Plaintiff became incontinent.

Plaintiff met with a physical therapist at Duane Waters Hospital on March 19, 2014.  The therapist provided exercise recommendations, but indicated that if they did not help within 90 days, then Plaintiff should be examined by a neurosurgeon.  On May 29, 2014, Plaintiff met with PA Bien who recommended a referral to a neurosurgeon.  Dr. Papendick and Dr. Stieve denied the referral to a neurosurgeon.  On June 4, 2014, Dr. Stieve issued an addendum denying Plaintiff additional pain medication and a referral to a neurosurgeon.  Plaintiff subsequently filed a grievance against Defendants Stieve, Neri, Papendick, Corizon, and Aetna complaining that they have a "Blanket Policy" of denying Plaintiff a referral to a neurosurgeon and denying him additional pain medication.

On July 14, 2014, Plaintiff filed a "formalized complaint" with Dr. Nelson, PA Bien, and Defendants Papendick, Stieve, and Corizon regarding his condition, including numbness on the left side of his head radiating down the left side of his face along his left temple and eye, as well as dizziness and feeling disoriented.  Two weeks later, after Plaintiff continued to complain about his symptoms, he filed a grievance against Nelson, Bien, Papendick, and Stieve, complaining that they were ignoring his new symptoms.

On October 21, 2014, Bien recommended that Plaintiff receive an MRI of his spine.  Dr. Papendick rejected the recommendation for lack of medical necessity, but instead approved an electromyograph (EMG) of Plaintiff's lower extremities.

On November 3, 2014, Plaintiff filed a grievance against claiming that certain individuals removed $10 from his prison account in order to discourage him from filing "formalized medical complaints" and grievances. The following day, Plaintiff filed a grievance against Defendants Nevai, Kingsbury, Paneque and Gulick, claiming that they "knew or should have known" that they put Plaintiff's health at risk by entering into a contract with Corizon and Aetna, who are "nationally recognized and re[k]nown for civil rights violations of deliberate [i]indifferen[ce] to prisoner's medical needs."

On November 24, 2014, Plaintiff participated in an EMG examination which showed evidence of "mild sensory peripheral polyneuropathy." Based on these results, PA Bien recommended that Plaintiff be issued Neurontin. On March 18, 2015, Dr. Kerstein reviewed Bien's recommendation and denied the medication. Plaintiff subsequently filed a grievance against Dr. Kerstein.

Plaintiff alleges that Defendants denied him proper medical treatment in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff further alleges that he was subjected to unlawful retaliation in violation of his First Amendment rights. Plaintiff also asserts various state law claims. Plaintiff seeks monetary damages as well as declarative and injunctive relief. Many of Plaintiff's claims were dismissed on screening. (ECF No. 6). At this juncture, only Plaintiff's claims against Defendants Aetna, Corizon, Kerstein, Rogers, Stieve, Papendick, and Neri remain. All the remaining Defendants now move for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).  A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324).  While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357.  The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252).  The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004).  Rather, the non-moving party

"must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54.  In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof  faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)).  The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same).  Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

**I.        Defendant Aetna Life Insurance Company**

As noted above, Plaintiff attributes much of his allegedly inferior medical care to decisions by Aetna, Corizon, and other MDOC officials to deny medical treatment to prisoners. As Plaintiff asserts, the State of Michigan and Prison Health Services (later known as Corizon Health) entered into a contract obligating Prison Health Services to provide health care services to prisoners within the custody of the MDOC. Plaintiff alleges that during the time period relevant in this matter, Aetna was employed as a subcontractor for Prison Health Services/Corizon and, therefore, participated in the actions giving rise to this action.

Aetna has presented evidence that on April 1, 2009, it entered into a contract with Prison Health Services to "provide claims administration services and access to a network of medical care providers." (PageID.608, 611-623). The contract was for an initial three year period, but also contained a "termination for convenience" clause which permitted either party to terminate the agreement "after the first year" by written notice. (PageID.620). On October 4, 2010, Prison Health Services notified Aetna in writing of its intent to terminate its contract with Aetna effective December 1, 2010. (PageID.608, 625-26). The contract between Aetna and Prison Health Services was, in fact, terminated on December 1, 2010. (PageID.608). Thus, subsequent to December 1, 2010, Aetna undertook no action concerning, effecting, or fairly attributable to prisoner health care within the MDOC. Plaintiff has presented no evidence indicating that there exists a factual dispute as to whether Aetna's contract with Prison Health Services was terminated as of December 1, 2010. Accordingly, as to Plaintiff's allegations concerning events subsequent to December 1, 2010, Aetna is entitled to relief on the ground that it played no part in the decisions or actions in question. As to any claims regarding decisions or

actions undertaken by Aetna prior to December 1, 2010, Aetna is entitled to relief on the ground that any such claims are untimely.

Plaintiff's claims against Aetna are asserted pursuant to 42 U.S.C. § 1983. Section § 1983 itself, however, contains no statute of limitations. *See, e.g., Bonner v. Perry*, 564 F.3d 424, 430 (6th Cir. 2009). In such a circumstance, the Court must borrow the statute of limitations of the most analogous state law cause of action. *Id.* (because "Congress has failed to legislate a statute of limitations for § 1983 claims," the Court must "borrow and apply to all § 1983 claims the one most analogous state statute of limitations"). The Supreme Court has held that "[b]ecause § 1983 claims are best characterized as personal injury actions. . .a State's personal injury statute of limitations should be applied to all § 1983 claims." *Owens v. Okure*, 488 U.S. 235, 240-41 (1989). Where the relevant state law provides multiple statutes of limitation for personal injury actions, courts are to apply the "general or residual statute for personal injury actions." *Okure*, 488 U.S. at 249-50; *Bonner*, 564 F.3d at 430. Michigan law articulates multiple statutes of limitation applicable to personal injury actions. *See* Mich. Comp. Laws § 600.5805. Accordingly, the limitations period applicable in the present action is three years, as articulated in Mich. Comp. Laws § 600.5805(10). *See Hardin v. Straub*, 490 U.S. 536, 540 (1989); *Jones v. City of Hamtramck*, 905 F.2d 908, 909 (6th Cir. 1990); *Jones v. City of Allen Park*, 167 Fed. Appx. 398, 407 (6th Cir., Jan. 3, 2006).[3]

While the Court looks to state law to identify the applicable statute of limitations, federal law must be applied when determining when the relevant limitations period begins to run. *See Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003); *Hebron v. Shelby County Government*, 406 Fed. Appx. 28, 30 (6th Cir., Dec. 22, 2010). Under federal law, the statute of limitations begins to run "when

---

[3] The *Hardin* and *City of Hamtramck* courts identified the relevant provision as Mich. Comp. Laws § 600.5805(8). This particular provision is presently codified at Mich. Comp. Laws § 600.5805(10).

plaintiffs knew or should have known of the injury which forms the basis of their claims." *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001); *Ohio Midland, Inc. v. Ohio Dept. of Transp.*, 286 Fed. Appx. 905, 911 (6th Cir., July 1, 2008).  A plaintiff has reason to know of his injury when he "should have discovered it through the exercise of reasonable diligence."  *Dotson v. Lane*, 360 Fed. Appx. 617, 619 n.2 (6th Cir., Jan. 5, 2010) (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)).

Plaintiff initiated the present action on March 31, 2015.  (PageID.39).  Thus, any claim regarding which the statute of limitations began to run prior to March 31, 2012, is untimely.  As noted above, Aetna's involvement with Prison Health Services and, by extension, the MDOC, ended on December 1, 2010.  Plaintiff could have, through the exercise of due diligence, discovered the existence of any possible claim against Aetna long before March 31, 2012.  Accordingly, any claims regarding decisions or actions undertaken by Aetna prior to December 1, 2010, are untimely.  For the reasons discussed immediately above, the undersigned recommends that Defendant Aetna's motion for summary judgment be granted.

## II.        Defendant Corizon Health Inc.

Plaintiff alleges that Corizon failed to provide him with appropriate medical treatment. However, Corizon is not vicariously liable for the actions of its employees and, therefore, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)); *Street v. Corr. Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996); *Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir., Mar. 26, 2001).

To impose liability against Corizon, Plaintiff must demonstrate that he suffered a violation of his federal rights "because of" a Corizon policy, practice, or custom. *See Thomas*, 398 F.3d at 429. To establish the existence of a policy, practice, or custom, Plaintiff must demonstrate the following: (1) the existence of a "clear and persistent pattern" of illegal activity; (2) that Corizon had notice or constructive notice of such; (3) that Corizon tacitly approved of the illegal activity, such that its "deliberate indifference in their failure to act can be said to amount to an official policy of inaction" and (4) that the policy, practice, or custom in question was the "moving force" or "direct causal link" in the constitutional deprivation. *Id.* at 429 (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

Plaintiff's pleadings contain no factual allegations that, even if accepted as true, would entitle him to prevail on a claim against Corizon. Accordingly, the undersigned recommends that Plaintiff's claims against Corizon be dismissed for failure to state a claim on which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

### III.        Denial of Medical Treatment Claims

As discussed above, Plaintiff alleges that Defendants Kerstein, Rogers, Stieve, Neri, and Papendick failed to provide him with appropriate treatment for his various ailments and complaints thereby violating his Eighth Amendment right to be free from cruel and unusual punishment.

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v.*

*Gamble*, 429 U.S. 97, 101-02 (1976).  Accordingly, the Eighth Amendment protects against the unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs."  *Estelle*, 429 U.S. at 104-06; *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001).

The analysis by which a defendant's conduct is evaluated consists of two-steps.  First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious.  A "serious medical need," sufficient to implicate the Eighth Amendment, is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008).  If the objective test is met, the Court must then determine whether the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it."  *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847).

To the extent, however, that the plaintiff simply disagrees with the treatment he received, or asserts that he received negligent care, the defendant is entitled to summary judgment.  *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Estelle*, 429 U.S. at 105-06) ("[m]edical malpractice

-14-

does not become a constitutional violation merely because the victim is a prisoner"); *Brown v. Kashyap*, 2000 WL 1679462 at *1 (6th Cir., Nov. 1, 2000) (citing *Estelle*, 429 U.S. at 106) ("allegations of medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment); *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010) (to prevail on an Eighth Amendment denial of medical treatment claim, "the inmate must show more than negligence or the misdiagnosis of an ailment"); *Robbins v. Black*, 351 Fed. Appx. 58, 62 (6th Cir., Nov. 3, 2009) ("mere negligence or malpractice is insufficient to establish an Eighth Amendment violation").

Defendants Kerstein, Rogers, Stieve, Neri, and Papendick have each submitted detailed affidavits describing their involvement and participation in Plaintiff's care. (PageID.1120-68, 2218-24, 2254-57). The assertions contained in these affidavits are supported by and consistent with the voluminous medical records detailing the extensive medical care Plaintiff has received. (PageID.1465-2139, 2225-52, 2258-61). This evidence reveals that Plaintiff has received extensive care for his various ailments and complaints. Plaintiff has presented no evidence which contradicts this evidence or which creates a genuine dispute as to any material fact. Instead, Plaintiff has responded to Defendants' factual submissions by describing the medical treatment he should have, in his lay opinion, received and, furthermore, asserts that Defendants are guilty of "misdiagnosis" of his condition and of prescribing a "less efficacious course of treatment." (PageID.2288).

Plaintiff's arguments and "evidence" reveal nothing more than his disagreement with Defendants' medical judgment and the treatment Defendants, in the exercise of such judgment, prescribed. While such may form the basis for a claim of medical malpractice, it simply fails to implicate the Eighth Amendment. In sum, Plaintiff cannot establish that Defendants were deliberately indifferent to his serious medical needs. Accordingly, the undersigned recommends that Defendants

Kerstein, Rogers, Stieve, Neri, and Papendick each be granted summary as to Plaintiff's Eighth Amendment claims.[4]

## IV.        Retaliation Claims

Plaintiff alleges that Dr. Neri subjected him to a prostate examination in retaliation for his "continuous complaining."  Plaintiff also alleges that several individuals, including Defendants Stieve and Papendick, removed $10 from Plaintiff's prison account in retaliation for Plaintiff's filing of grievances and complaints.

### A.        Plaintiff's Prison Account

Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust all available administrative remedies.  *See Porter v. Nussle*, 534 U.S. 516, 524 (2002).  Prisoners are no longer required to demonstrate exhaustion in their complaints.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007).  Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA" which the defendant bears the burden of establishing.  *Id.*  With respect to what constitutes proper exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion" defined as "compliance with an agency's deadlines and other critical procedural rules."  *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006).  In *Bock*, the Court reiterated that

---

[4] Defendant Kerstein has also moved separately for summary judgment based on Plaintiff's alleged failure to exhaust administrative remedies.  (ECF No. 36).  Resolution of this particular motion, however, is not necessary as Defendant is entitled to dismissal with prejudice of Plaintiff's claims for the reasons discussed herein.  Accordingly, the undersigned recommends that Defendant Kerstein's motion for summary judgment, (ECF No. 36), be denied without prejudice.

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Bock*, 549 U.S. at 218.

While Plaintiff submitted a grievance regarding his claim that $10 had been improperly removed from his trust account, the grievance fails to name Defendants Stieve or Papendick. (PageID.1208-13). Plaintiff's failure is contrary to MDOC policy which requires prisoners to include in their grievances "names of all those involved in the issue being grieved." Mich. Dep't of Corr. Policy Directive 03.02.130 ¶ R. In sum, Plaintiff has failed to properly exhaust these claims as to Defendants Stieve and Papendick. Accordingly, the undersigned recommends that these claims be dismissed without prejudice for failure to exhaust administrative remedies.

### B.  Prostate Examination

The elements of a First Amendment retaliation claim are well known: (1) Plaintiff was engaged in constitutionally protected conduct, (2) Plaintiff suffered adverse action which would deter a person of "ordinary firmness" from continuing to engage in such protected conduct, and (3) there exists a causal connection between the protected conduct and the adverse action - in other words, the adverse action was motivated at least in part by Plaintiff's protected conduct. *See Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

With respect to causation, courts recognize that retaliation is easy to allege and "is often very difficult to prove with direct evidence." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). Nonetheless, "bare allegations of malice" are insufficient to state a constitutional claim, as Plaintiff must

instead establish "that his protected conduct was a motivating factor" behind the allegedly retaliatory action taken. *Thaddeus-X*, 175 F.3d at 399 (citations omitted). Conclusory allegations of retaliatory motive are insufficient, however. *See Skinner v. Bolden*, 89 Fed. Appx. 579, 579-80 (6th Cir., Mar. 12, 2004). Instead, Plaintiff must, at a minimum, allege a chronology of events from which retaliation can plausibly be inferred. *See Desmone v. Adams*, 1998 WL 702342 at *3 (6th Cir., Sep. 23, 1998); *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004). On summary judgment, the causation element is analyzed under the burden-shifting framework articulated in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). *See Thomas v. Eby*, 481 F.3d 434, 441-42 (6th Cir. 2007). Accordingly, even if Plaintiff demonstrates that his protected conduct "was a motivating factor in the defendant's action," Defendant is entitled to summary judgment if he demonstrates that he "would have taken the same action even without the protected activity." *Eby*, 481 F.3d at 441-42.

Defendant Neri has presented evidence that he performed a prostate examination of Plaintiff because Plaintiff was "due for his annual digital rectal examination." (PageID.1145). Defendant Neri further asserts that the examination was performed appropriately and ethically in an effort to "assess for abnormalities." (PageID1145, 1152-53). Plaintiff has failed to present evidence contradicting or otherwise creating a dispute regarding these particular assertions. Thus, Plaintiff cannot establish the requisite causal element. Accordingly, the undersigned recommends that with respect to Plaintiff's claim of unlawful retaliation, Defendant Neri is entitled to summary judgment.

**V.**          **Plaintiff's State Law Claims**

Plaintiff has also asserted various state law claims against the remaining Defendants. Pursuant to 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a state law claim if it "has dismissed all claims over which it has original jurisdiction."  Indeed, "if the federal claims are dismissed before trial. . .the state claims should be dismissed as well."  *Taylor v. First of America Bank - Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also*, *Bah v. Attorney General of the State of Tennessee*, 610 Fed. Appx. 547, 555 (6th Cir., May 8, 2015) (same).  Accordingly, the undersigned recommends that the Court decline to exercise jurisdiction over Plaintiff's remaining state law claims and instead dismiss such without prejudice so that Plaintiff may pursue such in the appropriate state forum.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that Defendant's Motion for Summary Judgment, (ECF No. 36), be **denied without prejudice**; Defendant's Motion for Summary Judgment, (ECF No. 52), be **granted**; Defendants' Motion for Summary Judgment, (ECF No. 66), be **granted**; Defendants' Motion for Summary Judgment, (ECF No. 74), be **granted**; and this action **terminated**.  The undersigned further recommends that appeal of this matter would not be taken in good faith.  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997); 28 U.S.C. § 1915(a)(3).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file

objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,


Date:  September 19, 2016                              /s/ Ellen S. Carmody
                                                       ELLEN S. CARMODY
                                                       United States Magistrate Judge